1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF OREGON

11  EDWARD THEODORE RAY,              )
                                      )
12                  Plaintiff,        )
                                      )
13       v.                           )
                                      )    No. CV-04-863-HU
14  MAX WILLIAMS, Director of         )
    Corrections, Personally and       )
15  Professionally; RANDY GEER,       )
    Central Mail Administrator,       )
16  Personally and Professionally;)
    GUY HALL, Superintendent,         )
17  TRCI, Personally and Pro-         )
    fessionally; V. WILSON, Coun- )        FINDINGS & RECOMMENDATION/
18  selor/Mailroom Supervisor,        )    ORDER
    Personally and Professionally;)
19  and ALECA NELSON, Superin-        )
    tendent Exec. Assist., Per-       )
20  sonally and Professionally,       )
                                      )
21                  Defendants.       )
    ──────────────────────────────────)
22
    Edward Theodore Ray
23  Two Rivers Correctional Institution
    82911 Beach Access Road
24  Umatilla, Oregon 97882

25       Plaintiff Pro Se

26  / / /

27  / / /

28  / / /

    1 - FINDINGS & RECOMMENDATION/ORDER

Hardy Myers
ATTORNEY GENERAL
Leonard W. Williamson
SENIOR ASSISTANT ATTORNEY GENERAL
Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096

    Attorneys for Defendants

HUBEL, Magistrate Judge:

Plaintiff Edward Theodore Ray, an inmate at Oregon's Two Rivers Correctional Institution (TRCI), brings this 42 U.S.C. § 1983 action against Max Williams, the Director of the Oregon Department of Corrections (ODOC), Randy Geer, ODOC's Central Mail Administrator, Guy Hall, TRCI's Superintendent, V. Wilson, TRCI's mail room supervisor, and Aleca Nelson, Hall's executive assistant.

Plaintiff contends that defendants have violated his constitutional right to free speech under the First Amendment and the Oregon Constitution, his right to due process under the Fourteenth Amendment and the Oregon Constitution, and his right to peaceably assemble under the First Amendment and the Oregon Constitution. The allegations stem from ODOC's refusal to allow plaintiff to receive two books he ordered to be delivered to him at TRCI. He seeks injunctive relief and damages.

Defendants move for summary judgment. I recommend that defendants' motion be granted. Plaintiff moves to strike defendants' reply and accompanying affidavit. I deny that motion.

BACKGROUND

On or about November 26, 2003, plaintiff received a "Publication Violation Notice" informing him that a publication entitled "Cracking the Code, Third Edition," sent to him at TRCI, had been rejected by ODOC staff because the publication (1)

2 - FINDINGS & RECOMMENDATION/ORDER

contained material that threatened or was detrimental to the security, safety, health, good order, or discipline of the facility; (2) contained material that threatened or was detrimental to inmate rehabilitation; or (3) facilitates criminal activity. Exh. 2 to Compl.; Attchmt 3 to Geer Affid. at p. 1. The Publication Violation Notice cites specific page numbers of the publication that were considered objectionable. Id. The Publication Violation Notice also informs plaintiff that pursuant to Oregon Administrative Rule (OAR) 291-131-0050, he could request an independent review of the rejection by writing to the Functional Unit Manager or his or her designee, and requesting an administrative review. Plaintiff did so.

An administrative review was held on January 19, 2004, and continued on January 31, 2004. TRCI's mailroom supervisor V. Wilson conducted the administrative review. Plaintiff contends that at the first meeting with Wilson, she explained that the publication provided instruction on how to oppose lawful government authority through confrontation, described ways to avoid and delay responsibility, and instructed and advocated that its readers avoid legal and fiscal responsibilities and personal accountability through preparation and submission of fraudulent Uniform Commercial Code (UCC) forms. Exh. 12 to Compl. Plaintiff contends that Wilson was unable to point to an actual false and fraudulent form in the book. Id. She denied his request to send the book to his home at his expense and have the non-offending pages copied and returned to him. Id.

During the continued administrative review on January 31, 2004, plaintiff contends that Wilson indicated that the most

3 - FINDINGS & RECOMMENDATION/ORDER

appropriate reason for rejecting the book was because of inmate rehabilitation because throughout the entire book, it advocates readers to avoid legal and fiscal responsibilies.  Exh. 20 to Compl.  He contends that Wilson admitted that she herself did not understand what a fraudulent UCC form was, but that she was acting on orders from Geer at Central Mail Administration.  Id.

On February 18, 2004, Wilson wrote a formal memorandum to plaintiff affirming the original Publication Violation Notice. Exh. 38 to Pltf's Compl.; Attchmt 3 to Geer Affid. at p. 4.  She explained that the book was rejected in accordance with OAR 291-131-0035(2) which allows rejection of material that threatens or is detrimental to the security, safety, health, good order, or discipline of the facility, inmate rehabilitation, or facilitates criminal activity.  Id.  She noted that pages throughout the publication advocate that its readers seek to avoid legal and fiscal responsibilities and personal accountability through the preparation and submission of false and fraudulent UCC forms and so called "Redemption Movement" and "Strawman" filings.  Id.  Hall reviewed Wilson's decision and affirmed it.  Id.

After plaintiff received the Publication Violation Notice for "Cracking the Code, Third Edition," and while he was waiting for his administrative review of that notice, he received another Publication Violation Notice, this one for a publication entitled "One Man Out, The Redemption Process Formulated for those Incarcerated." Exh. 16 to Compl; Attchmt 4 to Geer Affid. at p. 1. The same justification was noted for the rejection of "One Man Out" as had been given for the rejection of "Cracking the Code, Third Edition."  Id.  Plaintiff was again advised of his right to an

4 - FINDINGS & RECOMMENDATION/ORDER

administrative review.  <u>Id.</u>  He requested a review.

Wilson conducted the administrative review of "One Man Out" with plaintiff on March 16, 2004. Exh. 47 to Compl.; Attchmt 4 to Geer Affid. at p. 11.  According to plaintiff, she informed him that Geer had determined that the publication threatened the safety, security, health, etc. of the facility and also facilitated criminal activity. Exh. 47 to Pltf's Compl. Plaintiff states that he reviewed several pages of the rejected publication that Wilson had with her and asked Wilson to show him exactly where the pages constituted a threat to safety, security, etc.  <u>Id.</u>  He further states that she refused to do so and she stopped the review.  <u>Id.</u>

Wilson affirmed the rejection of the publication.  Attchmt 4 to Geer Affid. at p. 1.  Her recommendation was upheld by P. Hoeye on March 24, 2004.  <u>Id.</u>

As Central Mail Administrator, Geer reviews publications for content that violates ODOC rules.  Geer Affid. at ¶ 4.  When he determines that a publication violates the rules, he sends a memorandum to all ODOC facilities, statewide, requesting that they reject the publication.  <u>Id.</u> Publications that do not comply with the rules are returned to the publisher, triggering a Publication Violation Notice to the sender and the intended inmate recipient. <u>Id.</u> at ¶ 5.  The inmate can then request an administrative review as plaintiff did in this case.

Geer issued a statewide memorandum on January 31, 2003, regarding "Cracking the Code, Third Edition."  <u>Id.</u> at ¶ 8; Attchmt 3 to Geer Affid. at pp. 2-3.  In that memorandum, Geer cited to particular pages of the publication and also noted that other unspecified pages throughout the book instructed and advocated that

5 - FINDINGS & RECOMMENDATION/ORDER

its readers seek to avoid legal and fiscal responsibilities and personal accountability through the preparation and submission of false and fraudulent UCC forms and so-called "Redemption Movement" and "Strawman" filings. Id. at p. 1. He also noted that pages 23-24 instructed and advocated direct action to oppose and challenge lawful governmental authority through confrontation. Id.

On January 14, 2004, Geer issued a statewide memorandum regarding "One Man Out." Geer Affid. at ¶ 13; Attchmt 4 to Geer Affid. at pp. 9-10. In the memorandum, Geer stated that materials throughout the publication threaten, or are detrimental to, the security, safety, health, good order, or discipline of the facility, inmate rehabilitation, or facilitates criminal activity. Attchmt 4 to Geer Affid. at p. 9.

STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)

6 - FINDINGS & RECOMMENDATION/ORDER

1  (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th

2  Cir. 1987)).  The nonmoving party must go beyond the pleadings and

3  designate facts showing an issue for trial.  Celotex, 477 U.S. at

4  322-23.

5      The substantive law governing a claim determines whether a

6  fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors

7  Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as

8  to the existence of a genuine issue of fact must be resolved

9  against the moving party.  Matsushita Elec. Indus. Co. v. Zenith

10  Radio, 475 U.S. 574, 587 (1986).  The court should view inferences

11  drawn from the facts in the light most favorable to the nonmoving

12  party.  T.W. Elec. Serv., 809 F.2d at 630-31.

13      If the factual context makes the nonmoving party's claim as to

14  the existence of a material issue of fact implausible, that party

15  must come forward with more persuasive evidence to support his

16  claim than would otherwise be necessary.  Id.; In re Agricultural

17  Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

18  California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

19  Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

20                              DISCUSSION

21  I.  First Amendment Free Speech Claim

22      Plaintiff's claim is not a facial challenge to the ODOC mail

23  regulations, but is one directed to the rejection of these two

24  specific publications.  The ODOC general mail regulation prohibits

25  material that threatens or is detrimental to the security, safety,

26  health, good order, or discipline of the facility, inmate

27  regulation, or facilities criminal activity.  OAR 291-131-0035(1),

28  (2).  The regulation then lists, by way of example only, eleven

7 - FINDINGS & RECOMMENDATION/ORDER

specific categories of material that meet the standard.  <u>Id.</u>

It is clear that a facial challenge to such a regulation would fail.  <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 419 (1989) (federal Bureau of Prisons regulations authorizing prison officials to reject incoming publications if determined to be detrimental to the security, good order, or discipline of the institution, or if it might facilitate criminal activity, facially valid).

Defendants assert that they are entitled to qualified immunity because under the analysis in <u>Turner v. Safley</u>, 482 U.S. 78 (1987), the prison mail regulation, and its application here, is reasonably related to a legitimate penological objective.  While defendants label their motion as one brought on the basis of qualified immunity, and they devote more than three pages of their brief to the standards for adjudicating qualified immunity, their analysis bears no relation to the appropriate qualified immunity inquiries of whether the facts stated by plaintiff demonstrate that a constitutional violation has occurred and if so, whether that right was clearly established at the time the alleged violation occurred, and whether the contours of the right were clear enough that a reasonable officer would have understood that what he or she was doing violated that right.  <u>Moreno v. Baca</u>, No. 02-55627, 2005 WL 517851, at *3 (9th Cir. Mar. 7, 2005).  Rather, defendants simply argue the merits of the claims.

I conclude that I need not address the qualified immunity issue because I agree with defendants that they should prevail on the merits.

Defendants correctly cite the four-part test announced in <u>Turner</u> as the appropriate analysis.  <u>Turner</u> explained that "when a

8 - FINDINGS & RECOMMENDATION/ORDER

prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. The Court stated that "such a standard is necessary if prison administrators and not the courts are to make the difficult judgments concerning institutional operations." Id. (internal quotation, brackets, and ellipsis omitted). "The Turner analysis applies equally to facial and 'as applied' challenges." Bahrampour v. Lampert, 356 F.3d 969, 975 (9th Cir. 2004).

A. Content Neutral/Legitimate Penological Interest

The first Turner factor examines if the regulations are content neutral and are rationally connected to a legitimate penological interest. Turner, 482 U.S. at 89-90. "In the prison context, regulations that apply to specific types of content due to specific inherent risks or harms are considered to be content neutral." Bahrampour, 356 F.3d at 975.

Geer explains that "Cracking the Code, Third Edition" advocates passive resistance against authority which is unauthorized in a correctional facility. Geer Affid. at ¶ 10. He states that allowing an inmate to behave in this manner would cause other inmates to imitate the behavior and create a general weakening of the ODOC staff's ability to maintain order. Id.

Defendants' Exhibit 103 contains excerpts from "Cracking the Code." Defts' Exh. 103. It is challenging to succinctly explain the theories advocated in this book. The book suggests its affiliation with a "Redemptionist" philosophy. E.g., Id. at p. 8. Redemptionists believe that citizens of the United States have been placed as collateral in bond for the security of the United States

9 - FINDINGS & RECOMMENDATION/ORDER

Department of the Treasury and have been placed on the rolls of the International Monetary Fund (IMF) in lieu of the national debt. Supp'l Geer Affid. at ¶ 6; Defts' Exh. 102 (Article from Anti-Defamation League entitled "Sovereign Citizen Movement" with section explaining Redemptionist theory); Defts' Exh. 104 (Article from Southern Poverty Law Center explaining Redemptionist philosophy).

Redemptionists assign an imaginary account number to some sort of direct treasury account, advocate that this direct treasury account has a balance equal to the monetary value the government places on the life of an individual, and then charge against this direct treasury account through the use of fraudulent checks called "sight drafts" by making written demand to the Department of Treasury for payments from the account. Id. The sight drafts appear to be real checks and business and financial institutions run the risk of cashing them before they discover the fraud. Id.; see also Attchmt 2 to Supp'l Geer Affid. (samples of various documents including sight draft purported to be drawn on Department of Treasury account).

Redemptionists believe government has no power over the live body of a person and all taxes, mortgage interest rates, and criminal convictions are against a "strawman" likeness of that live body. Id. Redemptionists then file UCC filings claiming their strawman is a commercial vehicle and make written demands for payment of services performed by the strawman or use of their copyrighted strawman name. Id.

As to "One Man Out," Geer explains that it too advocates passive resistance to authority, particularly law enforcement and

10 - FINDINGS & RECOMMENDATION/ORDER

government. Id. at ¶ 15. He states that the publication advocates and promotes business transactions through unauthorized channels to passively resist authority in any form. Id. He further states that any instruction or avocation of criminal behavior to inmates in ODOC custody is in direct opposition to the goal of ODOC's accountability model. Id.

Attachment 4 to Geer's Affidavit consists of pages from "One Man Out." The Table of Contents reveals that the book consists of some basic instructions and copies of various forms including a UCC-1 financing statement, various Internal Revenue Service forms, a notice of "sovereign status," various forms entitled "non-negotiable charge-back," including one for birth registration, birth certificate, military certificate, and social security card, and more. Attchmt 4 to Geer's Affid. Given that the subtitle of the publication is "The Redemption Process Formulated for those Incarcerated," the link with the Redemption movement is clear.

Over the years, various courts in various contexts have addressed some of the issues raised by the tactics used by the Redemptionist or sovereign citizen movement. E.g. United States v. Boos, 166 F.3d 1222, 1999 WL 12741 (10th Cir. 1999) (unpublished) (defendants convicted of corruptly endeavoring to obstruct or impede the due administration of the internal revenue laws by filing false UCC-1 financing statements listing the two IRS agents who attempted to collect defendants' back taxes as debtors); United States v. Fulbright, 105 F.3d 443, 452 (9th Cir. 1997) (noting, in case where defendant mailed false arrest warrants to bankruptcy judge and attempted to file false UCC-1 forms, that filing a false UCC form regarding the judge is prohibited by the statutes at issue

in the case - 18 U.S.C. § 372 (conspiracy to impede or injure federal officers); (18 U.S.C. § 1503 (obstruction of justice by intimidating or injuring federal officers)); United States v. Hilgeford, 7 F.3d 1340, 1342 (7th Cir. 1993) (rejecting as frivolous argument that an individual is a sovereign citizen of a state who is not subject to the jurisdiction of the United States and federal taxing authority); United Stats v. Orrego, No. O4 CV 0008 SJ, 2004 WL 1447954, at *2 (E.D.N.Y. June 22, 2004) (defendant's claim that he "copyrighted" his name, that a judge and an assistant United States attorney had used his name in fulfillment of their official duties without first obtaining permission to do so, and the filing of false liens against those individuals which contained false claims of payment, was a fraudulent scheme).

Based on the materials in the record and the cases indicating that the tactics advocated in these publications are unlawful, defendants demonstrate that the rejection of these books is related to a legitimate penological interest. The books urge their readers to commence a campaign of "paper terrorism" by filing false documents under a frivolous theory with no basis in reason. The resulting activity is unlawful. Corrections officials have a legitimate penological interest in keeping such material out of their institutions. While the publications at issue here do not suggest the recipe for a bomb or a method for prison escape, they nonetheless contain information for engaging in fraudulent, unlawful schemes. This is not consistent with the mission of a prison.

The rejection of these two publications was rationally

connected to a legitimate penological interest. See Pope v. Hightower, 101 F.3d 1382, 1385 (11th Cir. 1996) (reduction of criminal activity qualifies as a legitimate governmental objective); McCabe v. Arave, 827 F.2d 634, 638 (9th Cir. 1987) (suggesting that literature advocating illegal activity may be prohibited in prison).

B. Alternative Means of Exercising the Right

The next consideration is "whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 90. However, as explained by the District of Columbia Circuit, however, in considering this factor "the court does not view the right in terms of the materials excluded by the ban[.]" Kimberlin v. United States Dep't of Justice, 318 F.3d 228, 234 (D.C. Cir. 2003) (internal quotation omitted).

Thus, here, the question is not whether there are alternative means for plaintiff to obtain these or similar publications, but whether plaintiff has the right to access publications regarding the Uniform Commercial Code unconnected to the Redemptionist or sovereign citizen movement. No such publications appear to be prohibited by applicable ODOC mail rules. Additionally, Geer states that inmates can conduct legitimate business transactions after approval from the superintendent's office. Geer Affid. at ¶ 15. Plaintiff has sufficient alternative means of exercising his rights.

C. Effect on Others

The third Turner factor "requires an examination of the potential effects on the guards, other inmates, and prison resources if the asserted right is protected by the courts."

_Bahrampour_, 356 F.3d at 975. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. _Turner_, 482 U.S. at 90.

Defendants contend that the reasons Geer states as justifying penological objectives for the rejection of the publications demonstrate a significant negative ripple effect which could arise from the accommodation of the asserted right. Perhaps less apparent here than in other similar cases, I agree with defendants. Although posing no direct physical threat to the guards or other inmates, the publications, in advocating criminal activity and passing it off as a legitimate means of fiscal responsibility, could contribute to the growth of an anti-authority attitude and could establish a context for disputes over the legitimacy of the tactics advocated. And, as Geer notes, the passive resistance to authority alluded to in the publications could be imitated by other inmates, resulting in widespread anti-authority sentiment which in turn could create a weakening of ODOC staff's ability to maintain order.

D. Alternative Solutions

The fourth _Turner_ factor examines whether there are alternative solutions that would preserve the inmate's constitutional rights. _Bahrampour_, 356 F.3d at 976.

> If there are easily implemented and equally effective alternatives to the challenged regulations, the court may conclude that the regulations are an "exaggerated response" to the legitimate governmental interest. . . . If an inmate provides an alternative solution that will protect his rights at _de minimis_ cost to valid penological interests, it likewise is evidence of an

14 - FINDINGS & RECOMMENDATION/ORDER

exaggerated response. . . . If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation.

Id. (citations omitted).

Plaintiff suggests that defendants can redact the offending portions of the material. He also objects to defendants' refusal to mail the rejected books to his home address. Finally, in his request for injunctive relief, he requests that the ODOC be ordered to publish a list of rejected publications along with its reasons, on a website and have a hard copy available at institution law libraries, and that the ODOC be ordered to develop a method to pre-authorize publications. I address plaintiff's suggested alternatives in turn.

1. Redaction

Geer states that ODOC mailrooms, as of September 2002, processed an average of 24,000 pieces of mail each day for inmates in all Oregon facilities. Geer Affid. at ¶ 23. As Geer notes, the number of mail items processed today is likely considerably higher because previously prohibited bulk mail is now processed along with other mail items. Id. Additionally, the prison population has risen since September 2002, adding to the number of pieces of mail sent to ODOC institutions as a whole. Id.

During 2002, ODOC mailrooms rejected approximately 1 million mail items. Id. at ¶ 25. ODOC staff reviewed and rejected 443 publications for content, and reviewed and allowed another 76 publications. Id.

Geer states that redacting portions of publications creates many problems. Id. at ¶¶ 30, 31. Redaction could potentially

destroy the publication, especially if it contained many violations or if the reverse side of the violated material contained critical information. Id. at ¶ 30. If the publication were valuable, rare, or hard to find, the inmate would not appreciate the offending portions being removed. Id.

Additionally, redacting would require a significant amount of staff time and energy. Id. at ¶ 31. For example, Geer explains, one popular publication received by 1,000 inmates may have three pages of an issue which violate the rules. Id. If mailroom staff were required to redact, they would need to individually process each publication before it could be forwarded to the inmate. Id. This manual labor would have to be performed in addition to all normal, day to day mailroom activity. Id. It simply would not be feasible to perform the redaction in a timely manner.

Plaintiff's proposed redaction alternative is not reasonable. Defendants' evidence shows that the administrative burden created by a case by case redaction policy would be great. Moreover, the Supreme Court in Thornburgh approved of an "all or nothing" regulation which banned the entire publication. Thornburgh, 490 U.S. at 418-19. Redaction is not a de minimis alternative. Finally, even if redaction was an easily implemented option in theory, it would be difficult to apply in this case where the offending material is spread throughout the publications.

Plaintiff next suggests that rather than sending the publications back to the publisher, ODOC should send them to plaintiff's home where the non-offending pages can be redacted. Aside from the fact that, as noted in the preceding paragraph, the offending material is spread throughout the publications and

redaction is likely a practical impossibility, defendants are under no constitutional obligation to direct that the book be sent anywhere other than returned to sender. Geer Affid. at ¶ 19 (noting the lack of mailroom staff, storage space, or time available to process the thousands of publications that would be affected if inmates could designate an alternative address for a rejected publication). Inmates may direct the publisher to mail the publication to another address. Id.

Finally, plaintiff requests that ODOC publish a list of rejected publications to make available on a website and in institution law libraries and that ODOC pre-authorize publications. Although neither of these proposals are actually alternatives which would result in plaintiff receiving the rejected publications, I note here that inmates may request a copy of the list of rejected publications for $.50 per page. Id. at ¶ 35. Because the list changes frequently, inmates can send a written inmate communication to mailroom staff or to Geer if they have a question about a particular publication. Id. As to preauthorization, the list of rejected publications may be viewed as the flip side of a preauthorization list. That is, if the publication is not on the rejected list, the inmate will likely receive it.

Geer explains that the ODOC mail rules provide for preauthorization of packages not received directly from a publisher, but no preauthorization is received for books sent directly from a publisher because there is less likelihood of introducing contraband. Id. at ¶ 37. ODOC recommends that inmates check the rejected list before ordering a publication. Id. However, Geer explains, that even with materials not on the

17 - FINDINGS & RECOMMENDATION/ORDER

rejected list, a package is inspected and still could be rejected once its contents are examined. Id. Nothing more than what ODOC already does is constitutionally required in regard to publishing a rejected list and preauthorizing material.

In summary, on plaintiff's First Amendment free speech claim, defendants establish that the rejection of these two books is rationally related to a legitimate penological interest, that plaintiff has alternative means of exercising his First Amendment rights, that the impact of plaintiff's being allowed to receive these publications would negatively impact the institution, and that there are no ready alternatives to prohibiting the materials and sending them back to the publisher. I recommend that defendants' motion on the First Amendment free speech claim be granted.

II. Due Process Claim

In plaintiff's next claim, he contends that his due process rights have been violated because ODOC personnel failed to follow ODOC rules for mail rejection. However, violations of state law or state administrative rules do not provide a basis for a section 1983 claim. See Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003) (to allege a section 1983 claim, plaintiff must show he or she was deprived of a right secured by the Constitution and laws of the United States; section 1983 is a "method for vindicating federal rights"); Ybarra v. Bastian, 647 F.2d 891, 892 (9th Cir. 1981) (only federal rights, privileges, or immunities are protected by section 1983; "[v]iolations of state law alone are insufficient.").

To the extent plaintiff's due process claim can be viewed as

18 - FINDINGS & RECOMMENDATION/ORDER

a facial challenge the ODOC mail rules, it has no merit. "Withholding delivery of inmate mail must be accompanied by minimum procedural safeguards." <u>Sorrels v. McKee</u>, 290 F.3d 965, 972 (9th Cir. 2002) (internal quotation and brackets omitted). The inmate has a Fourteenth Amendment due process right in receiving notice that his or her incoming mail is being withheld by prison authorities. <u>Id.</u> In addition to notice, the inmate is constitutionally entitled to administrative review on the initial rejection. <u>See</u> <u>Prison Legal News v. Cook</u>, 238 F.3d 1145, 1152 (9th Cir. 2001) (failure to provide notice and administrative review of mail rejections deprives inmates of due process safeguards).

The ODOC administrative rules on prison mail provide for the constitutionally mandated due process notice and administrative review. OAR 291-131-0037(6) provides that when a publication from a non-inmate sender is rejected, the sender and the intended inmate recipient shall be notified of the rejection of the mail, including the reasons, on a Publication Violation Notice. Another rule provides that either a non-inmate sender or an intended inmate recipient of a rejected publication may request an administrative review within thirty days of the date of the rejection notice. OAR 291-131-0050(1)(a)(A), (B). Rules governing the administrative review require the functional unit manager's designee to review the original decision, the administrative review request, and where necessary, the rejected materials. OAR 291-131-0050(3)(a), (b). The designee must be someone other than the employee who originally rejected the publication. OAR 291-131-0050(3)(a).

Unless it is determined that the inmate's review of the rejected material may provide the inmate with information of a

19 - FINDINGS & RECOMMENDATION/ORDER

"nature which is deemed to pose a threat or detriment to the security, good order or discipline of the facility or to encourage or instruct in criminal activity," the inmate is permitted to review the rejected mail for purposes of the administrative review. OAR 291-131-0050(3)(c). The designee then is required to deliver a written recommended decision to the functional unit manager for his or her review and approval. OAR 291-131-0050(d). The functional unit manager, or his or her designee, is required to review the recommended decision and either affirm, reverse, or otherwise modify the original mail rejection decision in writing. OAR 291-131-0050(e).

These rules satisfy the constitutional due process requirements for rejection of inmate mail. See Procunier v. Martinez, 416 U.S. 396, 417-19 (1974) (upholding procedural safeguards that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence), overruled on other grounds, Thornburgh, 490 U.S. at 413-14; Rooks v. Zavares, No. Civ.A. 99-B-631, 2001 WL 34047959, at *31 (D. Colo. Jan. 25, 2001) (prison provided constitutional due process protections when plaintiff was allowed to grieve rejected publications and responses to grievances were made by prisons officials other than those who originally rejected the publications even though no actual hearing held).

Due process rights are not created by state procedural rules. Olim v. Wakinekona, 461 U.S. 238, 250 (1983). "Thus, although a

20 - FINDINGS & RECOMMENDATION/ORDER

state may have violated its own state procedural rules, no constitutional guarantee has been violated unless the state also failed to comply with the procedural requirements mandated by the Constitution." <u>Winburn v. Bologna</u>, 979 F. Supp. 531, 535 (W.D. Mich. 1997).

Plaintiff contends that defendants violated certain ODOC rules regarding the rejected publications. The undisputed evidence, however, shows that plaintiff received notice as to the rejection of both "Cracking the Code, Third Edition," and "One Man Out," and received administrative review of those rejections by prison officials who were not the persons who initially rejected the publications. For "Cracking the Code," Wilson conducted the review and her review was then reviewed and affirmed by Hall. For "One Man Out," Wilson conducted the review and then her review was reviewed and affirmed by Hoeye. Even if plaintiff is correct that defendants failed to comply with ODOC rules, because plaintiff received notice and an administrative hearing, he fails to show that any violation of ODOC rules resulted in a violation of his federal due process rights.

III. Peaceable Assembly Claim

In this claim, plaintiff contends that defendants' actions in rejecting the two publications restrict the "lawful assembly of citizens who advocate the use of the UCC." Compl. at p. 6. The First Amendment guarantees "the right of the people peaceably to assemble[.]" U.S. Const. amend. I. While incarceration does not deprive an individual of all constitutional rights, it is well established that a prisoner's associational rights are severely and "necessarily curtailed by the realities of confinement." <u>Jones v.</u>

North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132 (1977).

Turner's application is not limited to cases involving the free speech clause of the First Amendment. Rather, it provides the appropriate analysis for other questions regarding First Amendment rights for prisoners. E.g., Hart v. Cambra, No. C 96-0924 SI, 1997 WL 564059, at *7 (N.D. Cal. Aug. 22, 1997) (applying Turner to prisoner's peaceable assembly claim), aff'd, 161 F.3d 12 (9th Cir. 1998). The outcome under Turner for plaintiff's peaceable assembly claim is no different than it is for his free speech claim.

IV. Oregon Constitution Claims

Plaintiff alleges that defendants' actions violated various provisions of the Oregon Constitution. Defendants request that if their summary judgment motion is granted, that the Court decline to exercise supplemental jurisdiction over the remaining state constitutional claims. I recommend that defendants' request be granted.

Under the federal supplemental jurisdiction statute, a court may decline to exercise jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law;
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
> (3) the district court has dismissed all claims over which it has original jurisdiction; or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Here, both subsections (1) and (3) support declining jurisdiction. Plaintiff's state constitutional claims raise

22 - FINDINGS & RECOMMENDATION/ORDER

complex issues of state law and this Court is now dismissing all claims over which it has original jurisdiction. Thus, I recommend that plaintiff's state constitutional claims be dismissed pursuant to 28 U.S.C. § 1367(c)(1) and (3).

V. Plaintiff's Motion to Strike

Plaintiff moves to strike defendants' reply memorandum and Geer's supplemental affidavit submitted with the reply. Plaintiff first objects that defendants' reply does not contain a paragraph by paragraph numbered reply to plaintiff's response to defendants' initial Concise Statement of Material Fact. But, plaintiff's response to defendants' Concise Statement does not require a reply by defendants when plaintiff has not put forth his own affirmative factual assertions in separately numbered paragraphs but rather has only responded to defendants' assertions.

Next, plaintiff contends that defendants have inappropriately asserted new facts with their reply materials. However, in the motion to strike, plaintiff includes a sur-reply in the form of both argument and relevant facts. I have read this material in consideration of the motion for summary judgment. Given that plaintiff has had, in effect, an opportunity to reply to defendants' reply, the motion to strike is denied.

CONCLUSION

I recommend that defendants' motion for summary judgment (#16) be granted and that a Judgment in defendants' favor be entered. I deny plaintiff's motion to strike (#29).

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are

23 - FINDINGS & RECOMMENDATION/ORDER

due April 8, 2005.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due April 22, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this  24th  day of  March  , 2005.


                                    /s/ Dennis James Hubel
_____Dennis James Hubel
                                    United States Magistrate Judge

24 - FINDINGS & RECOMMENDATION/ORDER